**WEST GULF MARITIME ASSOCIATION, Plaintiff-Appellee,**

v.

**ILA DEEP SEA LOCAL 24, SOUTH ATLANTIC AND GULF COAST DISTRICT OF THE ILA; AFL–CIO, etc., et al., Defendants-Appellants.**

No. 84–2442.

United States Court of Appeals,
Fifth Circuit.

Jan. 7, 1985.

Thomas W. Gleason, Charles R. Goldburg, New York City, for defendants-appellants.

Royston, Rayzor, Vickery .& Williams, William Jensen, Marilyn T. Hebinck, Houston, Tex., for plaintiff-appellee.

Before GARZA, RANDALL, and TATE, Circuit Judges.

TATE, Circuit Judge:

The defendant longshoremen's labor unions appeal from a preliminary injunction entered by the United States District Court for the Southern District of Texas. 28 U.S.C. § 1292(a). The injunction restrains work stoppage and compels local arbitration of a dispute concerning the number of longshoring workers required to load and unload cargo containers. The district court entered the injunction on the authority of *Boys Markets, Inc. v. Retail Clerk's Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), which states a "limited" exception to the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. § 104, and permits an injunction restraining work stoppage where a union has agreed to arbitrate the grievance underlying the work stoppage. *See Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n,* 457 U.S. 702, 707–09, 102 S.Ct. 2673, 2678–79, 73 L.Ed.2d 327 (1982).

We hold that the district court should have dismissed or stayed the action or should have transferred it to the United States District Court for the Southern District of New York where a pending action involved closely related issues. Accordingly, we vacate the injunction and remand.

### Facts

The "containerization" issue has confronted the shipping industry for some time. Containers are metal boxes in which matter to be shipped is placed to facilitate easy handling in the loading and unloading process. Because containers reduce han-

dling by longshoremen during loading and unloading of vessels, containerization threatens to reduce the number of longshoring jobs.

Through collective bargaining, labor and management have attempted to solve the problem posed by containerization. Paragraph 5 of an agreement known as the containerization agreement (part of a master contract between the International Longshoremen's Association (ILA) and various employer associations, including the plaintiff below, West Gulf) provides:

> The minimum number of the container gang used in loading or unloading containers to or from container ships shall consist of 18 men plus two drivers.

The parties agree that paragraph 5 requires employers to "order" from the union no less than twenty workers when containers are to be loaded or unloaded.

The parties do dispute, however, whether paragraph 5 permits employers to use more than two workers in the twenty-worker unit as drivers. The union contends that, if an employer needs more than two drivers, it must order workers in addition to the twenty-worker unit. The employers of the Association, however, contend that workers within the "18 men" part of the twenty-worker unit may be used as drivers.

Such containerization disputes under the master contract are to be resolved by an entity known as the Emergency Hearing Panel. In the parties' so-called Tampa agreement, at paragraph IV, they provide:

> In order to correct all violations and to resolve all grievances it is agreed that an emergency panel of an equal number of representatives from each side shall be named by the President of the ILA and by Management for the purpose of hearing and resolving all cases relating to the Containerization Agreement, on an emergency basis at the earliest possible moment. It is agreed that the first of such meetings shall be convened in New York not later than the month of May, 1981. The Committee shall hold such further meetings, on an emergency and expedit-

ed basis, to the fullest extent necessary to resolve the above issues.

Further, the parties provide in an agreement known as the Hollywood agreement, at paragraph 6, for specific procedures to govern the Emergency Hearing Panel. Paragraphs 6(A) and 6(B) provide that alleged violations of the containerization agreement are "heard" at the local port under local procedures and, if there is failure to agree or one party wishes to appeal, the matter is "referred" to the Emergency Hearing Panel. Pursuant to paragraph 6(F), "[c]harges of alleged violations of the Master Agreement involving more than one port shall be referred directly to the Management-ILA Emergency Hearing Panel for final determination." Paragraph 6(C) provides that the Emergency Panel is constituted of an equal number of labor and management representatives and that a "majority vote" of the panel "shall be final and binding and shall constitute an enforceable award." Under paragraph 6(C), if the panel deadlocks, a "third party" (a neutral arbitrator) is selected "to break the deadlock". Finally, paragraph 6(E) explains when the right to stop work or strike exists:

> The ILA shall have the right to refuse to render service to any carrier or direct employer (but only with respect to the carrier charged) who, after a determination under Steps One and Two above [referring apparently to paragraphs 6(A), 6(B) and 6(F)] has been found to have violated the provisions of the said Master Agreement, and who refuses to abide by the decisions rendered under Steps One and Two above, and the provisions of any no-strike clause shall be rendered inapplicable in such situation.

In this case, the union referred the dispute concerning the meaning of "18 men plus two drivers" to the Emergency Hearing Panel at its meeting on June 12, 1984. At the meeting, a union representative made a motion "that the gang size shall be 18 plus two with drivers added to the twenty." The nine union members present voted in favor of the motion. Eight of the

management representatives voted against the motion, but the minutes show that one of these representatives was an alternate, not a regular panel member, and "it was subsequently determined that alternates were not entitled to cast a vote." As to the ninth management representative, one Costello, the minutes state: "When polled, Mr. Costello stated that he would abstain from voting. However, he subsequently stated that he would stand by the Master Contract. This was considered to be a vote in favor of the motion."

According to the minutes, the panel's co-chairman, Dickman, a management representative, declared that a "motion has been made and carried." In line with this ruling by Dickman, the minutes state:

> RESOLVED: That in accordance with the provisions of the Master Collective Bargaining Agreement, negotiated by and agreed to by the parties, the minimum size of a container gang shall be 18 men plus two drivers and that should additional drivers be required, such drivers are to be drawn from outside the gang and shall not be part of the regular 20-man gang.

. The panel's vote and the resulting resolution immediately became the subject of vigorous dispute. Management took, and continues to take, the position that the vote was invalid because allegedly, among other reasons, (1) local dispute resolution procedures were not followed prior to consideration by the Emergency Hearing Panel, (2) the agenda notice did not sufficiently describe the matter purportedly resolved by the panel's vote and resolution, (3) the agenda notice was not given at least five days before the panel's meeting, (4) the union's motion may not have carried because the vote of management's alternate was not counted, and (5) Costello's abstention, if that is what it was, did not give the union the majority required for a panel decision because it did not give the union more than one-half the available votes.

To settle the controversy about the vote and the ensuing resolution, the ILA filed on June 28, 1984 in the United States Dis-

trict Court for the Southern District of New York (Judge Sand) an action against West Gulf (the present plaintiff) to enforce the decision of the Emergency Hearing Panel. West Gulf responded by moving to dismiss for lack of personal jurisdiction or, alternatively, to transfer the action to the Southern District of Texas. On August 9, 1984, the district court in New York ruled that it had jurisdiction of West Gulf and denied West Gulf's motion to transfer the action to Texas.

While the motions to dismiss and transfer were pending in New York, West Gulf filed on August 3, 1984 in the Southern District of Texas the present action, from which this appeal arises. It named the ILA and its regional and local affiliates as defendants and, with respect to each of them, sought declaratory and injunctive relief. West Gulf specifically sought declarations that the decision of the Emergency Hearing Panel was invalid for the reasons outlined above and that its local practices did not violate the "18 men plus two drivers" provision of the master contract. West Gulf also sought by its complaint an injunction restraining the union defendants from refusing to fill orders for longshoremen made by employers who would not abide by the decision of the Emergency Hearing Panel (*i.e.*, enjoining a work stoppage) and requiring the union defendants to arbitrate at the local level the dispute about the number of drivers who could be taken out of a twenty-worker gang. On the day West Gulf filed its complaint, August 3, the district court issued an ex parte temporary restraining order concerning the work stoppage.

On August 13, 1984—four days after the district court in New York denied West Gulf's motion to transfer that action to the Southern District of Texas—West Gulf filed in the Southern District of Texas its application for a preliminary injunction, and the district court heard and granted the application that day. The application alleged that on August 3, 1984 ILA Deep Sea Local 24 refused to unload containers on a vessel docked at the Port of Houston

by refusing to fill an employer's order for a "container gang." According to the application, the local union refused to fill the order because the employer was in violation of the June 12, 1984 decision of the Emergency Hearing Panel.

West Gulf's application for a preliminary injunction asserted that "[t]he underlying dispute concerns the number of men in a 20-man container gang who may be utilized as drivers." West Gulf contended that the union's interpretation of the "20-man" provision of the master contract's containerization agreement is erroneous and that, in any event, the union is required to resolve the dispute through the Emergency Hearing Panel process, a process that allegedly had not been followed because the decision of the Emergency Hearing Panel was invalid. West Gulf also contended that the union's interpretation of the corresponding "20-man" provision in the relevant local contract is erroneous for the same reasons that applied to the master contract and that, in any event, the local contract differs from the master contract and authorizes the practice of taking more than two drivers out of a twenty-worker order. The local contract has its own arbitration procedure, which differs from the Emergency Hearing Panel procedure, and West Gulf contended that the local union violated that agreement by refusing to fill labor orders before completion of arbitration under the local procedure.

At the preliminary injunction hearing, West Gulf took the position that "it is inherent within the court's equitable powers to essentially preserve the status quo until such time as these issues are decided either by this court or by the Southern District of New York." West Gulf's counsel further explained its position:

I think the key to this whole thing is what the court pointed out that what we need to do is preserve the status quo until such time as the final decision has been made by the court until, number one, if Judge Sand in the Southern District of New York action decides that the decision of the Emergency Panel was

null and void because of deficiencies, that is going to end the matter.

The union defendants urged that West Gulf's Texas action should be dismissed because the issues it presented should be resolved by Judge Sand in the New York action:

There is an action pending in the United States District Court for the Southern District of New York. The title of the action is International Longshoremen's Association versus West Gulf Maritime Association. It is civil action No. 84–SD–4594. That action was filed prior to the action which is pending in this court.

In that case, the International Longshoremen's Association has brought a petition to confirm and enforce the arbitration award which is the basis of the present action here.

In that case, the West Gulf Maritime Association has raised all of the procedural objections which they are asserting before your honor in support of their application for injunctive relief.

Now, in view of the prior pendency of the New York federal action, we would ask Your Honor to dismiss the present action.

The district judge rejected the motion to dismiss West Gulf's action in Texas on the theory that West Gulf had as much right to file in Texas as the ILA had to file in New York. "Everybody wants to be on their home turf. And if we are going to talk about forum shopping, I think it comes out a draw." When informed that there would be "a risk of conflicting decisions" if the court were "to make any findings whatsoever," the district court responded: "Happens all the time." Counsel for the union defendants vigorously responded that the ordinary rule to prevent such conflicts requires the dismissal of a second-filed action where a previously filed action can resolve the important issues in both actions. The district court rejected this position:

Well, I am going to enter the preliminary injunction. . . .

I want, however, to be certain that everyone understands that developments

before Judge Sand that would affect this order in any fashion, let me know. And if what he does would indicate that this order ought to be dissolved I will act on it very, very quickly. And I am doing this only to maintain the status quo.

I feel that on the questions that are before Judge Sand, as I understand it, as to the validity as far as West Gulf is concerned of the decision of the Emergency Panel, that is before him. And I suppose what I am doing is not second guessing, but first guessing that what he is going to say they are entitled to arbitrate the matter in a different fashion than what they did. I am totally—I may be totally wrong about that, but all I am seeking to do by this order is maintain the status quo until those matters are determined. And I am saying that I think that the West Gulf Association is likely to succeed on that. And that is an arbitrable issue that ought to be done.

Though the entire hearing in the district court focused on the validity of the Emergency Hearing Panel decision and on the meaning of the "18 men plus two drivers" provision of the master contract's containerization agreement, the district court's preliminary injunction, drafted by West Gulf before the hearing, focused entirely on the local contract between West Gulf and the ILA local affiliate. The injunction finds as a fact that the union's refusal to fill container gang orders is a breach of "a provision" in the local agreement, though which provision is not specified. It finds that "the dispute causing the breach" is subject to the agreement's arbitration procedures, but it does not specify what the dispute is. The injunction indefinitely restrains the union defendants from "any work stoppage," and it is not limited to work stoppages regarding arbitrable disputes. Finally, the injunction commands all of the union defendants, not just those party to the local agreement, to submit to arbitration under the terms of the local agreement "the dispute concerning the makeup and size of container gangs."

## I. Labor Injunction Principles

■ The Norris-LaGuardia Act, 29 U.S.C. § 104(a), forbids courts to enjoin work stoppages "in any case involving or growing out of any labor dispute." See Jacksonville Maritime Ass'n v. International Longshoremen's Ass'n, 571 F.2d 319, 323 (5th Cir.1978). The Labor Management Relations Act, 29 U.S.C. § 185(a), however, permits courts to enjoin breaches of collective bargaining agreements. Id. The Supreme Court has found in the Labor Management Relations Act a narrow exception to the strictures of the Norris-LaGuardia Act: where labor and management have, by collectively bargained agreement, contracted to resolve certain disputes by arbitration or other informal dispute resolution mechanism, a union may be enjoined from stopping work until the dispute giving rise to the stoppage has been arbitrated or otherwise resolved in accordance with the parties' agreement. Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). In Boys Markets, the Supreme Court described its holding as a "narrow one" not intended to "undermine the vitality of the Norris-LaGuardia Act." Id. at 253, 90 S.Ct. at 1594.

The Supreme Court twice has emphasized the narrow contours of the Boys Markets exception to Norris-LaGuardia's general anti-injunction rule. Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n, 457 U.S. 702, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982); Buffalo Forge Co. v. United Steelworkers of America, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). In Jacksonville Bulk Terminals and Buffalo Forge, the Court emphasized in particular that, to be subject to injunction, a strike actually must be over an arbitrable dispute.

■ Because the Boys Markets injunction depends on the nexus between a work stoppage and an arbitrable dispute, it is essential to the validity of such an injunction that the injunction compel arbitration in addition to restraining work stoppage. "[T]he employer should be ordered to arbitrate, as a condition of his obtaining an

injunction against the strike." *Boys Markets, Inc. v. Retail Clerk's Union*, 398 U.S. 235, 254, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970), *quoting, Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 228, 82 S.Ct. 1328, 1346, 8 L.Ed.2d 440 (1962) (dissent). Indeed, this concept is at the heart of the holdings in *Jacksonville Bulk Terminals* and *Buffalo Forge;* the dispute causing work to be stopped must be arbitrable because an injunction restraining the stoppage may issue only if it compels arbitration of the underlying dispute.

## II. *Dispute Underlying Work Stoppage: Local or Master Contract?*

The district court compelled arbitration under provisions of the local contract. Certainly the local contract—to which the ILA was not a party—contains a provision relevant to the general container gang issue. Just as certainly, West Gulf contends the union defendants were in breach of the provision and may be entitled to an arbitration award declaring the breach, something about which we express no opinion. But the work stoppage in this case manifestly was not over a dispute about the meaning of the container gang provision of the local contract. To say that management alleges a breach of the local contract is not to say that the unions have stopped work over a dispute about that issue.

The refusal to fill orders for container gangs involved a dispute about the meaning of the "18 men plus two drivers" provision of the master contract's containerization provision. The application for a preliminary injunction itself demonstrates that the union, upon refusing to fill labor orders, consistently indicated its reliance on the decision of the Emergency Hearing Panel concerning that provision of the master contract's containerization provision. The entire discussion at the preliminary injunction hearing recognized as much in its focus on the validity of the Emergency Hearing Panel's decision. There is no way to view the dispute in this case realistically or meaningfully and to see it as other than a dispute concerning the validity of the Emergency Hearing Panel's decision and the obligation of affected employers to conform to its determination of the meaning of a key master contract term. *Cf. Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 720–23, 102 S.Ct. 2673, 2685–86, 73 L.Ed.2d 327 (1982) (taking practical view of underlying dispute causing strike).

The district court erred, therefore, in ordering arbitration under the local contract as part of its *Boys Markets* injunction. The essential issue is instead whether it was proper to enjoin the work stoppage in light of the arbitration provisions in the master contract agreements. The union contends that these agreements give it the right to stop work after a determination by the Emergency Hearing Panel. West Gulf contends that a work stoppage prior to judicial enforcement of the decision of the Emergency Hearing Panel would frustrate the contemplated arbitration process and therefore be in violation of the applicable no-strike provisions contained in the master contract documents. We believe that the unions have the better of this disagreement, *assuming* that the decision of the Emergency Hearing Panel is valid.

The general rule in this circuit is that "a *Boys Markets* injunction may continue in force pending judicial enforcement of the subsidiary arbitral award." *Sea-Land Service, Inc. v. International Longshoremen's Ass'n*, 625 F.2d 38, 42 (5th Cir.1980). *Sea-Land* states, however, that this general rule applies "absent express agreement to contrary." *Id.* The master contract agreements, entered into after the *Sea-Land* decision, contain such express agreement, set forth above, to permit work stoppage after an Emergency Hearing Panel Determination or, if the panel deadlocks, after the ensuing arbitral award.

West Gulf strenuously asserts that, as Paragraph 6(E) refers to the completion of step 1 (local procedures) and step 2 (the Emergency Hearing Panel and possibly a neutral arbitrator if there is deadlock), the failure to complete local dispute resolution in this case renders Paragraph 6(E) autho-

rization of immediate work stoppage inapplicable. The argument is considerably more technical than meaningful. The fact is that the relevant dispute was presented to and resolved by the Emergency Hearing Panel. *See San Antonio Newspaper Guild v. San Antonio Light Division*, 481 F.2d 821, 825 (5th Cir.1973). Whatever merit there might have been to West Gulf's contention that local arbitration procedures were not exhausted or that items at issue were governed by the local agreement and not the master contract, these issues were the subject of the dispute when referred to the Emergency Hearing Panel. West Gulf, having participated in the arbitral processes under the master contract before that panel, is subject to the usual principle of arbitration law that whether a matter is arbitrable under the agreement is for the arbitrator, not the courts. Moreover, West Gulf actually appeared in the New York district court proceedings brought to enforce the panel award against it; and its proper forum, *see* text at III, *infra*, to litigate these contentions was in that district court (as it in fact attempted to do, *see* note 7, *see also* note 5).

Further, if either party had prevailed under a full utilization of local procedures, the other undoubtedly would have referred the matter to the Emergency Hearing Panel. The matter would likewise have reached the panel in the event of deadlock at the local level. Moreover, paragraph 6(F) contemplates immediate referral of containerization disputes to the panel in the event of alleged violations at more than one port. The containerization dispute considered by the Emergency Hearing Panel involved every port subject to the jurisdiction of the panel. In short, the matter probably could have been referred directly to the panel.

In any event, thus, the dispute would have ended up before the panel, with the panel actually reaching a decision on the matter. Because the core intent of Paragraph 6(E) plainly is to authorize work stoppages after a panel decision, in these circumstances the union would be entitled to stop work if the decision of the panel was valid.

The controlling issue as to the injunction from which appeal has been taken is the validity of the Emergency Hearing Panel decision. This is what the parties and the district court recognized in their comments at the preliminary injunction hearing below. And, in our view, this is why West Gulf's declaratory and injunctive action should have been dismissed, stayed, or transferred to the Southern District of New York, as we explain next.

### III. *Comity and Dismissal, Transfer, or Stay*

The essential facts that guide our ultimate decision in this case are these: the New York action was filed over one month before the Texas action; the New York action involved petitions to enforce and vacate the decision of the Emergency Hearing Panel and therefore concerned the validity of that decision; the validity (or not) of the Emergency Hearing Panel decision was at the heart of West Gulf's entitlement to the declaratory and injunctive relief it requested in the Texas action; the Emergency Hearing Panel sat in New York; the containerization dispute before the panel affected the entire Atlantic and Gulf coasts; and Judge Sand in New York considered and denied a motion to transfer the New York action to Texas four days before the issuance of the preliminary injunction in this case. On these facts, the denial of the union defendant's request to dismiss the Texas action was an abuse of discretion.

■ The federal courts long have recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs. *E.g., Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952); *Covell v. Heyman*, 111 U.S. 176, 182, 4 S.Ct. 355, 358, 28 L.Ed. 390 (1884). "As between federal district courts, ... the general principle is to avoid duplicative litigation."

*Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976) (dictum). The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result. *E.g., id.* at 818–20, 96 S.Ct. at 1246–48; *Pacesetter Systems, Inc. v. Medtronic, Inc.,* 678 F.2d 93 (9th Cir.1982); *Washington Metropolitan Area Transit Authority v. Ragonese,* 617 F.2d 828 (D.C.Cir. 1980); *Calvert Fire Insurance Co. v. American Mutual Reinsurance Co.,* 600 F.2d 1228 (7th Cir.1979); *Gregory-Portland Independent School District v. Texas Education Agency,* 576 F.2d 81 (5th Cir. 1978); *Mann Manufacturing, Inc. v. Hortex, Inc.,* 439 F.2d 403 (5th Cir.1971). To avoid these ills, a district court may dismiss an action where the issues presented can be resolved in an earlier-filed action pending in another district court.[1] In particular, "[a] court may ... in its discretion dismiss a declaratory judgment or injunctive suit if the same issue is pending in litigation elsewhere." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 155, 87 S.Ct. 1507, 1519, 18 L.Ed.2d 681 (1967). *See Bergh v. Washington,* 535 F.2d 505, 507 (9th Cir.1976); *National Health Federation v. Weinberger,* 518 F.2d 711, 712 (7th Cir.1975).[2]

The District of Columbia Circuit has affirmed dismissal of a second-filed action where the first-filed action presented "a closely related question." *Washington Metropolitan Area Transit Authority v. Ragonese,* 617 F.2d 828, 830 (D.C.Cir.1980). The transit authority terminated a contractor for default, and a board designated by contract to decide such disputes upheld the termination and awarded the transit authority damages. *Id.* at 829. The contractor then sued the transit authority in the Eastern District of Virginia in a challenge to the board's decision. *Id.* at 830. The transit authority next sued the contractor in the District of the District of Columbia, alleging that it was entitled to immediate payment of board-awarded damages even though judicial review proceedings were pending. *Id.* In affirming the dismissal of the District of Columbia action, the appeals court noted that the District of Columbia action presented "a closely related question that could be raised in the Virginia proceedings." *Id.* The court held: "Considerations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously." *Id. See Columbia Plaza Corp. v. Security National Bank,* 525 F.2d 620 (D.C.Cir.1975).

The Ninth Circuit twice has reached a similar result. In *Bergh v. Washington,* 535 F.2d 505, 506–07 (9th Cir.1976), the court affirmed dismissal of an action aimed

1. In addition to outright dismissal, it sometimes may be appropriate to transfer the action or to stay it. A stay may, for example, be appropriate to permit the court of first filing to rule on a motion to transfer. If that court transfers the first-filed action, the stay could be lifted and the actions consolidated. If the transfer is denied, however, the stay could be lifted and the second-filed action dismissed or transferred.

2. The standard of appellate review of district court decisions to accept or decline jurisdiction over declaratory and injunctive actions when comity issues are at stake is not entirely clear. Some authority holds that the district court decision is discretionary; hence we would review only for abuse of that discretion. *See Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 183–84, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952); *Pacesetter Systems, Inc. v. Medtronic, Inc.,* 678 F.2d 93, 95 n. 2 (9th Cir.

1982). Other authority indicates that, while the district court's decision is one of discretion, "we may exercise our own judgment in determining whether a suit for declaratory and injunctive relief should be entertained." *National Health Federation v. Weinberger,* 518 F.2d 711, 712 (7th Cir.1975). Our own important federal comity decisions do not address the standard of review, though their language indicates that the rules discussed therein severely limit the district court's discretion. *Gregory-Portland Independent School District v. Texas Education Agency,* 576 F.2d 81 (5th Cir.1978); *Mann Manufacturing, Inc. v. Hortex, Inc.,* 439 F.2d 403 (5th Cir. 1971). We have no occasion to settle here on the standard of review because of our holding that, even if the district court had a broad discretion to resolve the comity issue it confronted, it abused that discretion in permitting the Texas action to proceed and in issuing the injunction.

at enjoining, among other things, the State of Washington from issuing certain fishing regulations; in part that affirmance was grounded on the existence in another district of an action in which the validity of those regulations was in issue. And in *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir.1982), the court affirmed dismissal of a second-filed action for a declaration of non-infringement of a patent where a first-filed action in another district sought damages for patent infringement and therefore raised identical issues, stating: "Normally sound judicial administration would indicate that when two identical actions are filed in courts of concurrent jurisdiction, the court which first acquired jurisdiction should try the lawsuit and no purpose would be served by proceeding with a second action."

This circuit has recognized and applied these comity principles that underlie the first-filed rule. *Mann Manufacturing, Inc. v. Hortex, Inc.*, 439 F.2d 403 (5th Cir. 1971). In *Mann*, we held that the court with "prior jurisdiction over the common subject matter" should resolve all issues presented in related actions. *Id.* at 408. At issue were actions in New York and Texas; in New York party A sued party B for a declaration of non-infringement of a patent, and in Texas party B sued party A for damages for infringement of a related patent. *Id.* at 405–06. The New York court earlier had enjoined B from suing in Texas on the same patent in issue in New York, and when B sued in Texas on the related patent, A filed a motion in New York to enjoin B from prosecuting that action in Texas. *Id.* Upon B's motion, the court in Texas enjoined A from pursuing its injunction application in New York. *Id.* Noting that the New York earlier had denied a motion to transfer the New York action to Texas, we reversed the Texas court's entry of the injunction and indicated that it was the New York court that should decide whether to try all issues relating to both patents. *Id.* at 407–08.

Once the likelihood of substantial overlap between the two suits had been demonstrated, it was no longer up to the court in Texas to resolve the question of whether both should be allowed to proceed. By virtue of its prior jurisdiction over the common subject matter and its injunction of suit involving the subject matter in Texas, the ultimate determination of whether there *actually* was a substantial overlap requiring consolidation of the two suits in New York belonged to the United States District Court in New York.

*Id.* at 408.

[R]egardless of whether or not the suits here are identical, if they overlap on the substantive issues, the cases would be required to be consolidated in New York, the jurisdiction first seized of the issues.

*Id.* at 408 n. 6. *See Gregory-Portland Independent School District v. Texas Education Agency*, 576 F.2d 81 (5th Cir.1978).

■ Our holding and discussion in *Mann* make plain that in this case the district court should have stayed, dismissed, or transferred West Gulf's action. The union defendants frankly advised the district court of the nature and circumstances of the New York action, and the parties and the court appeared to appreciate that the core issue in the New York action was the same as the core issue in the Texas action. The district court implicitly indicated that it would not resolve the declaratory judgment or *permanent* injunction issue in the Texas action, leaving the questions they involved to Judge Sand. Nevertheless, the district court issued a *preliminary* injunction in the Texas action, an action in which it contemplated no further orders or decisions, on the apparent theory that the preliminary injunction would not affect the New York action and, indeed, would preserve the status quo so that a decision there would be meaningful.

The central point, however, is that it was up to Judge Sand to determine whether an injunction was necessary. He had before him for over one month the same issues the district court in this case had only days to consider. Judge Sand was in the better position to know what was needed, if any-

thing, to preserve the status quo, as well as the likelihood of the parties to prevail that underlies issuance or not of a preliminary injunction.

Inevitably the district court's injunction intruded on Judge Sand's authority.[3] Despite the present district court's laudable willingness to avoid interference with the New York action, its finding that West Gulf is likely to succeed in fact intruded upon the New York court's decisional authority as to whether or not to grant injunctive or other relief arising out of the containerization dispute. The Texas judge's action is especially problematic in light of Judge Sand's earlier denial of the motion to transfer the New York action to Texas.[4]

The present Texas injunction also made more likely the piecemeal resolution of a difficult issue. The labor controversy at issue here exists in the First, Second, Third, Fourth, Fifth, and Eleventh Circuits. Within some of these circuits, the issue exists in multiple districts. It would be unwise to resolve separately in each of the affected districts in each of these circuits the question of issuing an injunction to prevent work stoppages relating to the Emergency Hearing Panel decision. The district court in New York is in a position to render a unitary decision as part of its consideration of the validity of the Emergency Hearing Panel decision. *See Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (affirming dismissal of federal action because pending state action would permit unified adjudication of rights in issue); *Zambrana v. Califano*, 651 F.2d 842 (2d Cir.1981) (affirming dismissal of declaratory and injunctive action where, among other things, other litigation would provide "a national solution to the problem").[5]

A different analysis leads to disharmony among the federal courts. The union de-

---

**3.** As regards a *Boys Markets* labor injunction, there exists a particularly close relationship between the issue of a preliminary injunction and the ultimate merits. Such an injunction, as indicated above, must be accompanied by an order to arbitrate. In this case, that would have required an order compelling further consideration by the Emergency Hearing Panel or a neutral arbitrator. In practical effect, that is essentially what was at stake in New York: had the dispute about container gangs been resolved by the Emergency Hearing Panel or must it be taken further along in the process? To compel the parties to go back to the Emergency Hearing Panel or to go to a neutral arbitrator would have constituted an implicit rejection of the validity of the initial Emergency Hearing Panel decision. Yet it is clear that this matter, as the district court recognized, was for Judge Sand to resolve.

**4.** *See also* note 7, below.

**5.** West Gulf could have asserted its claim for injunctive relief as a counterclaim in the New York action. Fed.R.Civ.P. 13; *Montgomery Elevator Co. v. Building Engineering Services Co.*, 730 F.2d 377 (5th Cir.1984) (defining compulsory counterclaim). *See Warshawsky & Co. v. Arcata National Corp.*, 552 F.2d 1257 (7th Cir. 1977) (court of first filing should enjoin parties from proceeding in court of second filing on counterclaim which should have been asserted in court of first filing); *Columbia Plaza Corp. v.*

*Security National Bank,* 525 F.2d 620 (D.C.Cir. 1975) (same); *American Civil Liberties Union v. Laird,* 463 F.2d 499 (7th Cir.1972) (Stevens, J.) (if issues in two actions not identical, parties can amend pleadings in the first action).

West Gulf argues, however, that it could not meaningfully seek declaratory and injunctive remedies in New York because all of the union defendants were not parties to the action in New York. Only the ILA was a party there. This is not a reason to deny the simultaneous pendency of two essentially identical actions. First, the work stoppage in issue arose over a directive from the ILA concerning the decision of the Emergency Hearing Panel, and an injunction against the ILA would afford West Gulf a basis for complete relief on its present injunction claim. Second, the other union defendants probably can be made parties to the New York court action in litigation concerning the Emergency Hearing Panel decision; they had sent the dispute that arose in Texas to the Emergency Hearing Panel for resolution in New York, and, so far as litigation concerning the panel's decision is concerned, it appears that a New York court would have jurisdiction over the local unions. Finally, the local union defendants are in privity with the ILA and working in concert with the ILA and could be bound by any injunction the district court in New York might issue. *Cf. National Health Federation v. Weinberger,* 518 F.2d 711 (7th Cir.1975) (second-filed action should be dismissed even though different plaintiffs involved in first-filed action).

fendants, after notice of the temporary restraining order issued in the Southern District of Texas, could have sought in the New York action an injunction prohibiting West Gulf from proceeding with its motion for a preliminary injunction in the Texas action. Considerable authority supports such a motion. *E.g., Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 552 F.2d 601 (5th Cir.1977); *Warshawsky & Co. v. Arcata National Corp.*, 552 F.2d 1257 (7th Cir.1977); *Columbia Plaza Corp. v. Security National Bank*, 525 F.2d 620 (D.C.Cir.1975). Yet it seems clearly better for parties to rely on the discretion of the court in the second-filed action to prevent duplicative litigation, rather than to require them to seek an injunction in another court to prevent such duplicative litigation.[6]

Events that occurred after the issuance of the injunction confirm the wisdom of deferring to the court of first filing. Judge Sand ultimately ruled that he could not discern the validity of the award and remanded the matter to the Emergency Hearing Panel (and thereafter, in the event of deadlock, to an arbitrator) for clarification of the panel's June 12, 1984 vote. In doing so, Judge Sand retained jurisdiction over renewed litigation after a decision by the panel or an arbitrator. The remand order is now on appeal to the Second Circuit.[7]

The Emergency Hearing Panel deadlocked on the meaning of the June 12, 1984 vote. Thereafter—on December 10, 1984—an arbitrator decided that the union's containerization motion had carried with the required majority vote and resulted in "a final and binding and enforceable award."

Thus, we confront (1) a panel decision that has not been vacated by a court, (2) a decision by Judge Sand expressing uncertainty about the panel's decision, but denying transfer of litigation to Texas and retaining jurisdiction over renewed litigation related to the panel's decision, (3) a Second Circuit appeal involving the panel's decision and Judge Sand's remand order, and (4) an arbitrator's decision that the panel's decision constitutes an enforceable award.

To review the merits of the injunction in this case, we unavoidably would pass on the merits of Judge Sand's decision and the arbitrator's decision and intrude into the issues to be decided by the Second Circuit. We believe ourselves constrained from deciding the merit issues so presented by the same principles of comity that made inappropriate the present district court's issuance of a preliminary injunction involving the merits of the action previously filed in and then pending before the district court in New York.[8]

*Conclusion*

For the foregoing reasons, the preliminary injunction is vacated and the case is remanded for entry of an order of stay, transfer, or dismissal, consistent with this opinion.

VACATED and REMANDED.

---

6. As in *Mann*, we distinguish between the granting of the temporary restraining order. West Gulf requested the restraining order ex parte and without mention in its moving papers of the New York action. At that time, a ship sat in the Port of Houston unloaded, and the district court could not have known of the comity concerns that required dismissal of West Gulf's action or other appropriate order.

7. Before dismissing the New York action, Judge Sand also had before him West Gulf's oral application for a preliminary injunction of the same tenor as the one issued below. Judge Sand took the question under submission, but did *not* grant the injunction. *See United States v. American Radiator & Standard Sanitary Corp.*, 388 F.2d 201, 203–04 (3d Cir.1967).

8. We recognize that the Fourth Circuit has affirmed a similar injunction. *Hampton Roads Shipping Ass'n v. International Longshoremen's Ass'n*, 746 F.2d 1015 (4th Cir.1984). *Hampton Roads* does not mention the comity issue, and it cannot be discerned if the parties raised the issue. It clearly is presented as an issue in this case.